IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TED WALTON**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:06-CV-2291-L** |
| | § | |
| **CITY OF MILFORD, TEXAS, and** | § | |
| **CHIEF OF POLICE CARLOS PHOENIX,** | § | |
| **in his official capacity,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendants' Traditional and No Evidence Rule 56 Motion for Summary Judgment, filed September 26, 2007. After carefully considering the motion, response, reply, summary judgment evidence, record, and applicable law, the court **grants in part** and **denies in part** Defendants' Traditional and No Evidence Rule 56 Motion for Summary Judgment.

**I.    Factual and Procedural Background**

Plaintiff Ted Walton ("Walton" or "Plaintiff") filed his Original Petition in the 40th Judicial District Court in Ellis County, Texas on October 30, 2006. Defendants removed the case to this court on December 12, 2006. Plaintiff brought claims against Defendants City of Milford, Texas, and Carlos Phoenix, in his official capacity, for: violation of his First Amendment rights pursuant to 42 U.S.C. § 1983; violation of the Texas Whistleblower Act; and violation of Texas common law as described in *Sabine Pilot Services, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985).

Plaintiff's complaint is based upon the termination of his employment as a City of Milford police officer by the Milford City Council. After being written up for several violations, Plaintiff

**Memorandum Opinion and Order - Page 1**

received three two-day suspensions. He appealed the suspensions by a letter to the Milford City Council. In his appeal, he made allegations against the Chief of Police, Defendant Carlos Phoenix, including a claim that Chief Phoenix set a ticket quota for Plaintiff. In a closed session, the City Council considered Plaintiff's appeal, and rather than ruling on his appeal, it returned to open session and made a motion to terminate his employment. Plaintiff alleges that his termination was in retaliation for complaining about illegal conduct, the alleged ticket quota.

### A. Plaintiff's Employment and Complaints About "Ticket Quotas"

Plaintiff began his employment on a part-time basis with the City of Milford as a police officer in March 2006 and moved to full-time status on May 15, 2006. Orig. Pet. ¶ 9; Defs.' App. Ex. 1. Plaintiff testified that he got the job with the City of Milford after talking with Chief Phoenix at a supermarket. Pl.'s App. 3. He stated that Phoenix asked if he could be as "productive for Milford as [he] was for Italy," the town where Plaintiff was working as a police officer at the time. *Id*. Walton says that he was hired without a formal interview or formal training. *Id*. at 7. Plaintiff, however, signed a form stating that his probationary period would last one year and accepted the terms set forth in the form, including: "Any conduct deemed inappropriate by the Chief of Police during the probationary period of a new hire will result in disciplinary action ranging from written warnings to termination." Defs.' App. Ex. 2.

Walton alleges that from the beginning of his employment, Chief Phoenix informed him that he was required to meet a certain quota for citations. He testified that when he was first brought into the police department, Chief Phoenix and Sergeant Timothy Westmoreland "advised that the [city] council likes around 300 [citations] a month." Pl.'s App. 8. Plaintiff states that although he was not explicitly told at the time, his portion of the 300 citations averaged 15 citations per shift. *Id*. at 8-9.

He also testified that he believed that if other officers in the department had a low volume of tickets in any given month, he understood that he was required to increase his citations to meet the 300 citations per month requirement. *Id*. at 11-12. Plaintiff argues that Chief Phoenix warned him that his job security was tied to meeting the 300 tickets goal. In his deposition, he stated that Chief Phoenix warned him: "the council wants 300. If we can't get that, then they'll have to cut the position. You, of course, being the lowest man on the totem pole, you'll be the first to go." *Id*. at 23.

Plaintiff testified that he complained of Chief Phoenix's alleged ticket quotas on several occasions. Plaintiff's testimony is somewhat conflicting as to the number of times he raised the issue with Phoenix. He testified that he had only one conversation with Chief Phoenix about the alleged ticket quota before his employment was terminated, but later in his deposition described a conversation he had with Phoenix "midway" through his employment regarding his ethical concerns with the ticket quota. *Id*. at 42, 49. Plaintiff also states that he had several conversations regarding the ticket quota with Sergeant Westmoreland. *Id*. at 44-45.

Beyond the police department, Plaintiff argues that he complained of the ticket quota to Claude Wakefield, the mayor of Milford, and Mike McGraw, the Ellis County District Attorney. The summary judgment evidence shows that Walton testified that he had two conversations with McGraw, only one of them before his employment was terminated. *Id*. at 46-49. He stated that he "advised him of the stresses, the fact of participating in set quotas, Number 1, made it stressful. Number 2, that I had felt it takes the reason of being a cop out of being a cop, you know, the public

safety factor." *Id*. at 48. The evidence does not support Plaintiff's claim that he spoke with Mayor Wakefield.[1]

### B. Plaintiff's Warnings and Suspensions

Plaintiff was employed by the City of Milford from March 27, 2006 until August 23, 2006. During this time, Walton received various warnings and suspensions that ultimately culminated in the Milford City Council's decision to terminate his employment.

Walton received his first warning on July 18, 2006, a warning by Chief Phoenix for failure to properly fingerprint and authenticate suspect fingerprint cards. Defs.' App. Ex. 3. On the card, Chief Phoenix wrote: "I know I have told you before that the suspect must put his signature on this card. This needs to be the last time I tell you." *Id*. Plaintiff admitted that he had made this mistake "at least five or six times." *Id*. Ex. 24 (Walton Dep. 56).[2] Walton disputes that this note from Chief Phoenix was an official "warning" or write-up.[3]

Walton's formal warnings and suspensions grew out of events that occurred on August 13, 2006. Plaintiff contends that on that day, he decided that despite the alleged ticket quota, he would not write any traffic citations, and that his suspensions resulted from the fact that he only wrote one ticket on August 13, 2006. Pl.'s App. 35.

---

[1]Plaintiff cites to his Appendix pages 41-42. Pages 40 and 41 of Plaintiff's Appendix were not included in the appendix filed, either electronically or as part of the courtesy copy received by the court. Page 42 details certain conversations Plaintiff had, but it is impossible to determine with whom he had these conversations.

[2]Defendants' Appendix is not paginated, in violation of Local Rule 56.6(b)(3). The final two exhibits, Sandra Smith's business records affidavit and Walton deposition excerpts, were not given separate exhibit numbers. The court considers the Smith affidavit Exhibit 23 and the Walton deposition excerpts Exhibit 24.

[3]Plaintiff states that Chief Phoenix's deposition supports this contention, but cites to his own deposition in support.

**Memorandum Opinion and Order - Page 4**

On August 13, 2006, Plaintiff stopped a twenty-one year old woman for speeding. Defs.' App. Ex. 5. According to the notarized official complaint filed by her father against Walton, after she was stopped, Walton ordered her to follow him while he pursued another vehicle. *Id*. The woman followed Walton off the interstate and onto a side road and sat in her car while Plaintiff began a search of the second vehicle. *Id*. The complainant's father stated that Walton had acted "recklessly" by placing his daughter "in an extremely dangerous situation." *Id*. While Plaintiff testified that he advised the woman to follow him while he proceeded after another suspect, his actions were not "out of line" and that his conduct was "appropriate." *Id*. Ex. 24 (Walton Dep. 91-94).

On August 13, 2006, Walton received several written warnings. One warning was for "carelessness" for failing to prevent the escape of a suspect. *Id*. Ex. 8. After Walton stopped the second vehicle, a handcuffed suspect was placed in the car of Officer Casey McCabe, another officer on the scene. *Id*. Officer McCabe warned Plaintiff that the suspect was a flight risk. *Id*. Walton asked a wrecker driver on the scene to watch the suspect. *Id*. Ex. 6. The suspect managed to get his hands in front of him, roll down the window in the patrol car, and escape through the window. *Id*. Ex. 8. Sergeant Westmoreland described Plaintiff's actions as "neglect of duties" and he recommended disciplinary action against Officers McCabe and Walton. *Id*. Ex. 6. Both officers received a written warning and a two-day suspension without pay. *Id*. Exs. 7, 8.

Plaintiff received a second written warning for his conduct on August 13, 2006. He was warned for conduct in violating the City of Milford's standard operating procedure. *Id*. Ex. 9. Specifically, Plaintiff was warned because he took "a subject that was a passenger in a vehicle and placing him in handcuffs and putting him in the back seat of his patrol vehicle . . . [because] the

passenger did not have any Identification on his person." *Id*. As a result, Walton received a second written warning and an additional two days off without pay. *Id*.

Plaintiff received a third warning for turning off his microphone during a traffic stop and for using unnecessary profanity. *Id*. Ex. 10. Sergeant Westmoreland also commented on this, noting that Walton acted "unprofessional in using numerous curse words." *Id*. Ex. 6. Plaintiff received another two days off without pay as part of this warning. *Id*. Ex. 10.

The next day, August 14, 2006, Sergeant Westmoreland contacted Plaintiff regarding an investigation into the traffic stop and suspect escape. *Id*. Ex. 11. Plaintiff was uncooperative, stated "You mother f****** can talk to me when I'm on duty," and hung up the phone. *Id*. The warning was for conduct, and stated: "If this conduct should occur EVER again, either suspension or termination will be recommended to the Chief of Police." *Id*.

C.    **Plaintiff's Appeal and Termination**

Although Plaintiff did not fill in the section for employee remarks on the written warnings, he sent a letter on August 16, 2007 appealing his suspensions to Sergeant Westmoreland, City Secretary Sandra Smith, and Mayor Wakeland. *Id*. Ex. 12. His letter first accused Chief Phoenix of asking him to dig up "dirt" on Sergeant Westmoreland so that the Chief could fire him. *Id*. He also put his accusations about a ticket quota into writing, and stated that on August 14, 2006, after a day of not writing any tickets, he was threatened with write-ups and suspensions. *Id*. Walton complains that other officers engaged in similar behavior without being warned or suspended, that he was not given training, and that he had never signed the Milford "Policy book" when he began working for the city. He concludes: "I am notifying the City secretary that I wish to appeal; the

disciplinary actions given to me by Chief Phoenix. I would also like someone to look into the inter departmental dysfunction to find out why Chief is conspiring against his officers." *Id*.

Plaintiff contends that after receiving the letter, Mayor Wakeland, Chief Phoenix, and Ty Evans, a liaison between the police department and City Council, met to discuss the letter prior to the City Council meeting on August 23, 2006. Evans testified that while they discussed Walton's allegations about a ticket quota and his concerns about Chief Phoenix, his suspensions were not the subject of the meeting. Pl.'s App. 112. Chief Phoenix's testimony regarding the subject matter is the same, and he stated that he "denied the ticket quota. I did not deny the dirt." *Id*. at 79.

Walton's appeal was heard by the Milford City Council on August 23, 2006. Plaintiff contends that he, Chief Phoenix, and Sergeant Westmoreland addressed the City Council, which then went into executive session to consider the appeal.[4] The City Council deliberated for approximately two hours. When the City returned to open session, Walton's employment was terminated for violating his probation and the City Council took no action as to his appeal. Defs.' App. Ex. 13.

Defendants now move for summary judgment on each of Plaintiff's claims. They argue that the City Council had good cause to terminate Plaintiff's employment and that there is no genuine issue as to any material fact as to Plaintiff's claims for First Amendment retaliation or pursuant to *Sabine Pilot* or the Texas Whistleblower Act. Defendants also argue that Plaintiff's official capacity claims against Chief Phoenix should be dismissed as duplicative of his claims against the City.

---

[4]Plaintiff's Appendix omits pages 37-38 and 81-82, the pages that are cited in support of this contention.

**Memorandum Opinion and Order - Page 7**

## II. Legal Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Ragas*, 136 F.3d at 458. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). The party opposing summary judgment is required to identify specific evidence

in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## III.     Analysis

### A.     Introduction

Defendants argue that all of Plaintiff's claims should be dismissed. They contend that Plaintiff's official capacity claims against Chief of Police Carlos Phoenix are duplicative of his claims against the City of Milford; that the *Sabine Pilot* claim fails because Plaintiff fails to identify any illegal act; that the First Amendment claim fails because Plaintiff's speech was private; and that the whistleblower claim fails because Plaintiff failed to make a good faith report of illegal conduct or that he made any report to an appropriate law enforcement authority. Plaintiff responds that his official capacity, First Amendment, and whistleblower claims cannot be dismissed. Plaintiff does not respond to Defendants' arguments regarding the *Sabine Pilot* claim. The court determines that because Plaintiff failed to respond to Defendants' motion on this claim, he has abandoned his *Sabine*

*Pilot* claim, and it is no longer before the court. *See Skotak*, 953 F.2d at 915-16. Accordingly, the court **dismisses with prejudice** Plaintiff's *Sabine Pilot* claim.

### B. Official Capacity Claims

Defendants have moved to dismiss Plaintiff's claims against Phoenix in his official capacity, arguing that these claims are redundant because they are nothing more than claims against the City of Milford, a named Defendant in this lawsuit. Plaintiff argues that he may bring both claims, and cites *Owens v. Independence*, 445 U.S. 622 (1980), for the proposition that either Defendant is sufficient to impose liability.

A lawsuit against an individual in his or her official capacity is treated as a lawsuit against the governmental entity of which the individual is an employee, official, or representative. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Brooks v. George County, Miss.*, 84 F.3d 157, 165 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996). As Defendants correctly argue, the City of Milford is already a Defendant. The official capacity claims, therefore, are redundant and serve no purpose. Dismissal of the official capacity claims against Defendant Phoenix is appropriate.[5] *See Flores v. Cameron County, Tex.*, 92 F.3d 258, 261 (5th Cir. 1996).

### C. First Amendment Claim

Defendants move to dismiss Plaintiff's First Amendment retaliation claim; they contend that his speech was not public, or in the alternative, was primarily private in nature. Plaintiff responds

---

[5]This analysis is equally applicable to Plaintiff's claim under the Texas Whistleblower Act, as that statute makes clear that it is the governmental entity that is sued, for which sovereign immunity is waived. Tex. Gov't Code § 554.0035 (Vernon 2004).

**Memorandum Opinion and Order - Page 10**

that his speech involved a public concern, that his interest in his speech outweighs any governmental interest, and that his speech motivated the City's decision to terminate his employment.

To prevail on a First Amendment retaliation claim, a public employee must show: "(1) []he suffered an adverse employment action; (2) [his] speech involved a matter of public concern; (3) [his] interest in commenting on matters of public concern outweighs the employer's interest in efficiency; and (4) [his] speech motivated the employer's adverse action." *Modica v. Taylor*, 465 F.3d 174, 179-80 (5th Cir. 2006) (citing *Johnson v. Louisiana*, 369 F.3d 826, 830 (5th Cir. 2004)).

Defendants argue that Plaintiff's speech is entirely private, because it was made in the context of his appeal to the Milford City Council. In the alternative, Defendants argue that Plaintiff's speech was "mixed" speech, involving both public and private concerns, but that the private concerns dominate. "[T]wo inquiries . . . guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen of a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 1958 (2006).

Defendants point to *Teague v. City of Flower Mound, Texas*, and argue that both the analysis of "mixed" speech and the result are instructive in this case. 179 F.3d 377 (5th Cir. 1999).[6] In *Teague*, the two police officer plaintiffs became aware of wrongdoing by another officer. *Id*. at 379. Both officers began investigations, but the chief of police stopped the investigations and hired an outside private investigation firm. *Id*. The outside firm cleared the officer of all wrongdoing. *Id*.

---

[6]*Teague* remains good law in this circuit, though the Fifth Circuit has noted that it has "used varying approaches with respect to analyzing mixed speech cases," comparing the "content-form-context" test to the "citizen-employee" test used in *Teague*. *Stotter v. University of Texas at San Antonio*, 508 F.3d 812, 826 (5th Cir. 2007). The court declined to decide which approach was appropriate for mixed speech cases, noting that the distinctions between the tests are "somewhat artificial," and finding that under either test, the speech at issue would not be protected. *Id*. at 826 n.4.

**Memorandum Opinion and Order - Page 11**

The plaintiffs requested a meeting with the chief of police but were refused, and the chief stated that the district attorney's office had also cleared the officer. *Id*. Teague called an assistant district attorney regarding the officer and was told that the office had not looked into the matter at all. *Id*. Believing that the chief of police was involved in a cover-up of the officer's wrongdoing, plaintiffs filed a grievance against the chief of police. *Id*. Meanwhile, both plaintiffs were voluntarily transferred, and the chief of police began an investigation of them using the outside firm because of the backlog of cases in plaintiffs' division. *Id*. Upon beginning the investigation of plaintiffs, the chief of police gave them administrative warnings and placed them on administrative leave. *Id*. The investigation concluded that plaintiffs had been derelict in their duties, and the chief of police fired plaintiffs. *Id*. Plaintiffs appealed, and the town manager sustained the termination. *Id*.

In *Teague*, the court recognized that "speech regarding police misconduct constitutes a matter of public concern." *Id*. at 381 (citing *Forsyth v. City of Dallas*, 91 F.3d 769, 773-74 (5th Cir. 1996), *cert. denied*, 522 U.S. 816 (2007) and *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988)). At the same time, "we have held that speech concerning the conditions of one's employment is a private matter." *Id*. (citing *Gillum v. City of Kerrville*, 3 F.3d 117, 120-21 (5th Cir. 1993), *cert. denied*, 510 U.S. 1072 (1994)). The court held that the *Teague* plaintiffs' speech was not protected because it was motivated by personal interests:

> During all relevant events, [plaintiffs] were acting in their capacity as employees embroiled in an employment dispute. Their focus . . . was primarily on clearing their names - not on rooting out police corruption *per se*. . . .
>
> Although interspersed with apparently genuine concerns regarding police wrongdoing, [plaintiffs'] grievances were primarily motivated by, and primarily addressed, concerns particular to their private interests.

*Id.* at 383-84.

Plaintiff responds to Defendants' motion by arguing that both the August 16th letter of appeal and Walton's spoken concerns about ticket quotas made at other times are protected speech. Plaintiff contends that because his speech involved wrongdoing and illegality, it is related to a matter of public concern. Walton also argues that his appeal of his suspension is protected by the First Amendment, and allowing his termination through the appeal of his suspension will have a chilling effect. Finally, Plaintiff argues that his speech was primarily public in nature and that his letter was written as a private citizen to inform the city of Chief Phoenix's wrongdoing.

The court first considers the August 16 letter appealing Plaintiff's suspension and including allegations about Chief Phoenix's wrongdoing and a ticket quota. The court determines that *Teague* controls given the similarities between the facts in that case and those now before the court. Despite Plaintiff's protest that his letter was written as a private citizen, it is clear to the court that these written complaints were brought as part of his appeal process. As in *Teague*, though Walton may have "genuine concerns" about police wrongdoing, the letter itself was primarily motivated by his desire to appeal his discipline. While the letter contains statements that could be considered relating to a public concern, the court determines that Walton's speech in the August 16 letter is not protected speech because it was primarily motivated by his personal interests. As far as Plaintiff's argument that this determination would have a chilling effect on appealing disciplinary decisions, the court determines that *Teague* resolves this concern, as the court found that similar complaints made by the plaintiffs in the context of a police officer's appeal were not protected speech.

Next, the court considers comments made by Walton to others about the alleged ticket quota. Plaintiff has provided competent summary judgment evidence that he made such remarks to Chief

Phoenix, Sergeant Westmoreland, and District Attorney McGraw. The court determines that these comments do not support a First Amendment retaliation claim. Plaintiff has provided no evidence that anyone on the City Council had knowledge of his verbal complaints. Accordingly, even if there is some protected public speech in the conversations Plaintiff allegedly had with Westmoreland, Phoenix, and McGraw, there is no evidence that the members of the City Council, those who ultimately made the decision to terminate Walton's employment, had any knowledge of this potentially protected speech. Therefore, Plaintiff cannot show the fourth element – that his speech motivated the adverse employment action.

Neither the August 16 letter nor earlier remarks made by Plaintiff regarding an alleged ticket quota are sufficient to support a claim for First Amendment retaliation. Accordingly, the court does not reach the additional arguments made by Plaintiff. Because there is no genuine issue of material fact as to Plaintiff's First Amendment retaliation claim, the City of Milford is entitled to judgment as a matter of law.

### D. Whistleblower Claim

Defendants also move to dismiss Plaintiff's Texas whistleblower claim brought pursuant to section 554.002(a) of the Texas Government Code. The pertinent statute provides:

> A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of the law by the employing government entity or another public employee to an appropriate law enforcement authority.

Tex. Gov't Code § 554.002(a) (Vernon 2004). "To show causation, a public employee must demonstrate that . . . the employee suffered discriminatory conduct . . . that would not have occurred

when it did if the employee had not reported the illegal conduct." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000).

Defendants argue that Plaintiff failed to make a good faith report of a violation of law and that any alleged report played no role in the decision to terminate his employment. Plaintiff argues that his complaints fall within the protection of the Texas Whistleblower Act.

The court considers first Defendants' argument that any report made by Walton was not in good faith. Defendants argue that there is no evidence that Plaintiff specifically was ever given a ticket quota, and contend that the section of the Texas Transportation Code prohibiting traffic-offense quotas applies only to a situation where an individual officer is given a specific quota. The pertinent statute provides:

> (a) A political subdivision or an agency of this state may not establish or maintain, formally or informally, a plan to evaluate, promote, compensate, or discipline:
>> (1) a peace office according to the officer's issuance of a predetermined or specified number of any type or combination of types of traffic citations; . . . .
>
> (b) A political subdivision or an agency of this state may not require or suggest to a peace office, a justice of the peace, or a judge of a county court, statutory county court, municipal court, or municipal court of record:
>> (1) that the peace office is required or expected to issue a predetermined or specified number of any type of combination of types of traffic citations within a specified period. . . .

Tex. Trans. Code § 720.002 (Vernon 1999). Defendants argue that the statements requiring 300 citations for the department as a whole fail to meet either statutory definition. Defendants also cite the Texas Supreme Court's holding that the court may more closely examine Plaintiff's good faith beliefs because he is a law enforcement officer. *Harris County Precinct Four Constable Dep't v.*

*Grabowski*, 922 S.W.2d 954, 956 (Tex. 1996). Plaintiff points to his deposition testimony that he and Chief Phoenix had a "set number" of citations he was to write each shift. Pl.'s App. 18-19. While a court should more closely examine the reasonableness of a peace officer's belief that a law has been violated, this holding does not defeat Walton's claim. In *Grabowski*, the peace officer only presented evidence of the violation of an internal departmental policy as opposed to the violation of any law. The Texas Supreme Court apparently, at least insofar as a peace officer is concerned, does not consider the violation of a departmental policy to be a violation of the law as defined in section 554.001(1). In this case, Walton has set forth evidence that could constitute the violation of a state statute and his belief was reasonable in light of his experience and training. Accordingly, the court determines that there is a genuine issue of material fact as to whether Plaintiff was specifically given a quota, and whether he acted in good faith making a complaint about the ticket quota.

Next, Defendants argue that Plaintiff failed to make a report of any violation of law by the Milford police department. They contend, without citing any authority, that Plaintiff should have made his report to the Texas Attorney General, Texas Department of Transportation, or Texas Department of Public Safety. They argue that his complaint to any employee of the police department, the City Secretary, the Mayor, or the City Council fail to meet the requirement that a report be made to an appropriate law enforcement agency. Defendants argue that a report to one's employer does not meet the standard required for a whistleblower claim under Texas law.[7]

---

[7]In its reply, the City cites *County of Bexar v. Steward*, 139 S.W.3d 354, 361 (Tex. App. – San Antonio 2004, no pet.) (quoting *Texas Dep't of Transportation v. Needham*, 82 S.W.3d 314, 321 (Tex. 2002)), in support of its argument that an employee must report wrongdoing to an entity other than his or her employer. The court does not believe that *Steward* supports this contention, and notes that the court in that case specifically "caution[ed] that our holding should not be read to broadly apply to all facts." *Id*. at 362.

Pursuant to the Whistleblower Act, an "appropriate law enforcement authority" is defined as "a part of a state or local governmental entity or of the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law." Tex. Gov't Code § 554.002(b). The section of the Texas Transportation Code at issue does not provide for criminal sanctions for a violation, but does provide: "A violation of this section by an elected official is misconduct and a ground for removal from office. A violation of this section by a person who is not an elected official is a ground for removal from the person's position." Tex. Trans. Code § 720.002(e). The court determines that Plaintiff's complaints to the City Secretary, Mayor, and members of the City Council are sufficient to establish that Plaintiff made a good faith effort to report a violation of law, because the City Council ultimately had the power to enforce the law by removing Chief Phoenix or other members of the police department, if it established that there was a violation of the Texas Transportation Code regarding ticket quotas.

Plaintiff's other complaint was to District Attorney McGraw. The court finds determining whether Walton had a good faith belief that his report to the District Attorney's office was a report to an appropriate law enforcement authority is a closer question, but one that need not be resolved, because there is no competent summary judgment evidence that anyone on the City Council or in the police department knew that Walton had made a complaint to him.

Because the court finds that Plaintiff made a good faith effort to report a violation of law, the court must consider whether there is a genuine issue of material fact with respect to causation. Defendants argue that there are legitimate reasons for the City Council's decision to terminate Walton's employment, and point to his conduct on August 13, 2006 and August 14, 2006. Plaintiff

**Memorandum Opinion and Order - Page 17**

responds that the City Council's stated reasons for terminating Plaintiff are false and pretextual. The court recognizes that there is certainly ample proof that Plaintiff engaged in serious unprofessional conduct as a police officer in August 2006; however, it has carefully reviewed the transcript of the City Council's closed session considering Walton's appeal. Comments made by City Council members, such as Mr. Knight's remark that "[t]hese folks are going out and just stirring stuff in this little ol' community . . . and all it does is bring discredit to the whole department," Pl.'s App. 178, when read in the context of the entire transcript are enough to support a reasonable inference that a jury could find a causal link between Walton's report of illegal conduct and his termination.

Because the court determines that there is a genuine issue of material fact as to the element of causation in Plaintiff's whistleblower claim, the City of Milford is not entitled to judgment as a matter of law at this time. The decision on such a fact question falls to the jury, not to the court on a motion for summary judgment.

## IV. Conclusion

For the foregoing reasons, the court **grants in part** and **denies in part** Defendants' Traditional and No Evidence Rule 56 Motion for Summary Judgment. The court **dismisses with prejudice** Plaintiff's claims against Defendant Carlos Phoenix in his official capacity because they are redundant of his claims against the City of Milford. Plaintiff's *Sabine Pilot* claim is **dismissed with prejudice** because he abandoned the claim. The court **dismisses with prejudice** Plaintiff's

**Memorandum Opinion and Order - Page 18**

First Amendment retaliation claim because there is no genuine issue of material fact as to this claim.

Remaining for trial is Plaintiff's Texas Whistleblower Act claim against Defendant City of Milford.

**It is so ordered** this 28th day of February, 2008.

/s/ Sam A. Lindsay
Sam A. Lindsay
United States District Judge